**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| The Save the Peaks Coalition, et al., | ) | No. CV 09-8163-PCT-MHM |
| Plaintiffs, | ) ) | **ORDER** |
| vs. | ) ) | |
| United States Forest Service, et al., | ) ) | |
| Defendants. | ) ) ) | |

This lawsuit concerns challenges under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 - 4370(d) to the United States Forest Service's 2005 decision to allow Intervenor-Defendant Arizona Snowbowl Resort Limited Partnership ("the Snowbowl") to upgrade its operations by allowing the production of man-made snow using non-potable Class A+ reclaimed wastewater.  See Ariz. Admin. Code § R18-11-303. Plaintiffs are specifically challenging whether the 2005 Environmental Impact Statement prepared and issued by the Forest Service in connection with this upgrade violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 - 4370d ("NEPA") by failing to properly and sufficiently consider and address the possibility or likelihood that people would ingest snow made from Class A+ reclaimed wastewater and the health impact of such potential ingestion.

Currently pending before the Court are Plaintiffs' The Save the Peaks Coalition,

1  Kristin Huisinga, Clayson Benally, Sylvan Grey, Don Fanning, Jeneda Benally, Frederica

2  Hall, Berta Benally, Rachel Tso, and Lisa Tso's Motion for Summary Judgment, (Doc. 74),

3  and Motion to Strike, (Doc. 101).   Also pending are Intervenor-Defendant Arizona

4  Snowbowl Resort Limited Partnership's ("the Snowbowl's") Motion to Strike Plaintiffs'

5  Citation to the Vacated Ninth Circuit Panel Opinion, (Doc. 85), and Motion for Summary

6  Judgment, (Doc. 88), as well as Defendant United States Forest Service and Earl Stewart, in

7  his official capacity as Forest Supervisor for the Coconino National Forest's ("the Federal

8  Defendants") Motion for Summary Judgment, (Doc. 92).  After reviewing the pleadings and

9  conducting oral argument on July 20, 2010, the Court issues the following order.

10  **I.      FACTUAL AND PROCEDURAL HISTORY**

11       Most of the core facts in this case are not disputed.  The San Francisco Peaks are part

12  of 1.8 million acres of public federal land located within the Coconino National Forest.

13  Since at least 1938, people have been attracted to the snow-covered slopes of the San

14  Francisco Peaks for skiing and winter recreation activities.   As winter sports activity

15  increased over time, a ski area was developed and expanded on the western flank of the San

16  Francisco Peaks—with a Poma lift installed in 1958, and a chair lift installed in 1962. The

17  ski area, currently known as the Arizona Snowbowl, is located entirely on 777 acres of land

18  within the Coconino National Forest.  The Snowbowl operates under a Forest Service-issued

19  Special Use Permit ("SUP") pursuant to the Forest Ski Area Permit Act of 1986, 16 U.S.C.

20  § 497(b).  The SUP is renewable on a 40-year basis. In 1979, the Snowbowl introduced a

21  master plan for upgrading the ski area. The master plan included proposals for the installation

22  of new lifts, trails, and facilities.  Shortly after the Forest Service approved the Snowbowl's

23  proposed upgrades in 1979, several Native American Tribes challenged the decision in

24  federal court. The Forest Service's decision approving the master plan was ultimately upheld

25  by the District of Columbia Court of Appeals. See Wilson v. Block, 708 F.2d 735 (D.C. Cir.

26  1983), cert. denied, 464 U.S. 956 (1983).

27       In 2002, Intervenor-Defendant Snowbowl submitted to the Forest Supervisor for the

28  Coconino National Forest a formal proposal entitled the "Arizona Snowbowl Facilities

Improvements Proposal." The goals of the Proposed Action were twofold: (1) to provide a consistent and reliable operating season and (2) to improve safety, skiing conditions, and recreational opportunities by bringing terrain and infrastructure into balance with existing demand. The proposed action included a request for snowmaking from non-potable Class A+ reclaimed wastewater supplied by the City of Flagstaff through a previously authorized agreement with the Snowbowl.  The en banc Ninth Circuit characterized the non-potable Class A+ reclaimed wastewater that is to be utilized on the Snowbowl as follows:

> The recycled wastewater to be used for snowmaking is classified as "A+" by the Arizona Department of Environmental Quality ("ADEQ"). [] A+ recycled wastewater is the highest quality of recycled wastewater recognized by Arizona law and may be safely and beneficially used for many purposes, including irrigating school ground landscapes and food crops. [] Further, the ADEQ has specifically approved the use of recycled wastewater for snowmaking.
>
> *          *          *
>
> The recycled wastewater that will be used at the Snowbowl "will undergo specific advanced treatment requirements, including tertiary treatment with disinfection. In addition, the reclaimed water will comply with specific monitoring requirements, including frequent microbiological testing to assure pathogens are removed, and reporting requirements."[] Further, the recycled wastewater will "comply with extensive treatment and monitoring requirements under three separate permit programs: the Arizona Pollutant Discharge Elimination System ("AZPDES") Permit, the Arizona Aquifer Protection Permit Program, and the Water Reuse Program." []

Navajo Nation v. United States Forest Serv., 535 F.3d 1058, 1065 (9th Cir. 2008) (en banc), cert. denied, 129 S.Ct. 2763 (2009) (internal citations and internal footnote omitted).

In September 2002, the Forest Supervisor for the Coconino National Forest issued a scoping notice on the Forest Service's Proposed Action for improvements at the Snowbowl to interested individuals, public agencies, and other organizations. The notice included a summary of the proposed action, including the proposal to create snow from Class A+ reclaimed wastewater.

On October 7, 2002, the Forest Service published a notice of intent to prepare an Environmental Impact Statement ("EIS") in the Federal Register. The notice stated that the chief feature of the Proposed Action was to produce artificial snow from Class A+ reclaimed

wastewater on 203.5 acres of skiing terrain within the SUP area. See 67 Fed. Reg. 62435 (Oct. 7, 2002). On February 2, 2004, the Forest Service issued a Draft Environmental Impact Statement ("DEIS"). On February 18, 2005, the Forest Supervisor for the Coconino National Forest issued the Final Environmental Impact Statement ("FEIS") for the Arizona Snowbowl Facilities Improvements proposal. The Record of Decision ("ROD") was then issued on February 18, 2005. The ROD selected Alternative Two, which includes authority to make snow from Class A+ reclaimed wastewater. The Forest Service thereafter received twenty-eight appeals from fifty-nine individuals and organizations. (See AR Index, p. 15 - 17) (listing individuals and organizations who submitted materials to the Appeal Deciding Officer).

In June 2005, four groups of plaintiffs, composed of several Native American Tribes and Nations, along with various individuals, and environmental organizations, filed suit in the United States District Court for the District of Arizona, challenging the Forest Service's actions in the Arizona Snowbowl Facilities Improvements Project. The cases were consolidated into a single action before the Honorable Paul G. Rosenblatt. See Navajo Nation v. United States Forest Serv., 408 F. Supp. 2d 866 (D. Ariz. 2006) (consolidating Nos. CV 05-1824-PCT-PGR, CV-05-1914-PCT-EHC, CV-05-1949-PCT-NVW, CV-05-1966-PCT-JAT). The plaintiffs in the consolidated Navajo Nation litigation consisted of the Hopi Tribe, the Navajo Nation, the White Mountain Apache Nation, the Yavapai-Apache Nation, the Hualapai Tribe, the Havasupai Tribe, Norris Nez, Bill Bucky Preston, Rex Tilousi, Dianna Uqualla, the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network. The Navajo Nation plaintiffs brought claims for alleged violations of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb et seq., the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 et seq., the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the Grand Canyon National Park Enlargement Act, 16 U.S.C. § 228i ("GCEA"), the National Forest Management Act, 16 U.S.C. §§ 1600-1687 ("NFMA"), and a count alleging the United States had failed to

comply with its trust responsibilities to the various Native American Tribes and Nations. See Navajo Nation, 408 F. Supp. 2d at 871.

With respect to NEPA, the Navajo Nation plaintiffs' complaint specifically alleged that "(1) the [FEIS] failed to consider a reasonable range of alternatives to the use of recycled wastewater; (2) the FEIS failed to discuss and consider the scientific viewpoint of Dr. Paul Torrence; (3) the FEIS failed adequately to consider the environmental impact of diverting the recycled wastewater from Flagstaff's regional aquifer; and (4) the FEIS failed adequately to consider the social and cultural impacts of the Snowbowl upgrades on the Hopi people." Navajo Nation, 535 F.3d at 1079.   At summary judgment, the plaintiffs for the first time raised a claim that "the FEIS failed adequately to consider the risks posed by human ingestion of artificial snow." Id.   As the en banc Ninth Circuit noted, "[the relevant] complaint did not include this NEPA claim or the factual allegations upon which the claim rests." Id.  The defendants in the Navajo Nation lawsuit responded to this new argument in their appeal brief contending that the plaintiffs had failed to properly plead this new NEPA claim in the complaint.  The plaintiffs countered by moving the district court for leave to amend their complaint to add the NEPA claim relating to the risks posed by human ingestion of  snow made with Class A+ reclaimed wastewater.  The district court denied the motion for leave without comment.  Navajo Nation, 408 F. Supp. 2d at 908 ("IT IS FURTHER ORDERED that the Navajo Plaintiffs' Motion to Amend/Correct Amended Complaint (Doc. 75) is DENIED").

The district court ultimately granted summary judgment for the defendants on all claims, except the RFRA claim, which was similarly denied after a lengthy trial to the bench. See id.  The case was then appealed.  On appeal, a three-judge Ninth Circuit panel affirmed in part, and reversed in part, the district court's ruling. See Navajo Nation v. United States Forest Serv., 479 F.3d 1024 (9th Cir. 2007), vacated, 506 F.3d 717.   The panel opinion reversed the district court's grant of summary judgment on the RFRA issue, as well as the single NEPA claim regarding risks posed to human health from the ingestion of snow made from reclaimed wastewater.

1    The case proceeded to en banc review, where the en banc Ninth Circuit Court of

2    Appeals affirmed the district court's grant of summary judgment and entry of judgment in

3    favor of the defendants in all respects. Navajo Nation, 535 F.3d at 1080 ("We affirm the

4    district court's entry of judgment in favor of the Defendants on the RFRA claim, and the

5    district court's grant of summary judgment to the Defendants on the NEPA and the NHPA

6    claims."). As to the single NEPA claim concerning the risks posed to human health from the

7    ingestion of snow made from reclaimed wastewater—the claim for which the district court

8    was reversed by the initial panel—the en banc Ninth Circuit noted that "Plaintiffs raised this

9    claim for the first time in their motion for summary judgment" and held that "[b]ecause the

10   [plaintiffs] failed sufficiently to present this NEPA claim to the district court and also failed

11   to appeal the district court's denial of their motion to amend the complaint to add this NEPA

12   claim, the claim is waived on appeal." Id. Following the Ninth Circuit's en banc decision,

13   the Navajo Nation plaintiffs filed a petition for writ of certiorari with the United States

14   Supreme Court, which was denied on June 8, 2009. See Navajo Nation v. United States

15   Forest Serv., 129 S. Ct. 2763 (2009).

16   On September 9, 2009, Plaintiffs filed the instant litigation. In this case, Plaintiffs The

17   Save the Peaks Coalition, Kristin Huisinga, Clayson Benally, Sylvan Grey, Don Fanning,

18   Jeneda Benally, Frederica Hall, Berta Benally, Rachel Tso, and Lisa Tso have filed a

19   Complaint against Defendants the United States Forest Service and Earl Stewart, in his

20   official capacity as Forest Supervisor for the Coconino National Forest pursuant to NEPA.

21   (See Doc. 1). On December 3, 2009, this Court granted the Snowbowl's Motion to Intervene

22   as a Defendant. (Doc. 19).

23   Plaintiffs' Complaint alleges several NEPA violations. Count One alleges that "the

24   FEIS does not contain a reasonably thorough discussion of the significant aspects of the

25   probable environmental consequences of the project—the FEIS ignores the possibility of

26   children (and others) eating snow made from reclaimed wastewater." (Doc. 1, p. 12). Count

27   Two alleges that "by failing to analyze impacts of eating snow made from reclaimed sewer

28   water, the [Forest Service] failed to ensure the scientific integrity of its analysis." (Id., p. 14).

1  Count Three alleges a "failure to disseminate quality information" on the part of the Forest

2  Service. (Id., p. 15).  The current Plaintiffs ask that the Court find that the Defendant's

3  actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

4  with law; and/or [] without observance of procedure required by law, as mandated by the

5  APA." (Id., p. 16).  Plaintiffs also request injunctive relief in the form of (1) a finding by this

6  Court that the FEIS was inadequate as a matter of law; (2) a finding that the Forest Service

7  violated NEPA in approving the Snowbowl improvement project; (3) the issuance of a

8  mandatory injunction that would stay all action in furtherance of the Snowbowl improvement

9  project until the Forest Service can comply with all applicable laws and regulations; and (4)

10  hold that the Forest Service action was unlawful and set it aside. (Id.)

11        On February 24, 2010, Plaintiffs filed a Motion for Leave to Amend Complaint, (Doc.

12  39), in order to add an additional Count alleging that the Forest Service "failed to consider

13  significant new information" since the ROD was issued in February 2005, in violation of

14  NEPA.  On September 22, 2010, that Motion was denied as untimely and lacking good cause.

15  (Doc.135).

16        On March 12, 2010, Plaintiff filed a Motion for Summary Judgment on all Counts.

17  (Doc. 74).  On April 2, 2010, Intervenor-Defendant Snowbowl filed a Motion to Strike

18  Plaintiff's Citation to the Vacated Ninth Circuit Panel Opinion. (Doc. 85). On April 9, 2010,

19  the Snowbowl filed a Motion for Summary Judgment, in which it argued that Plaintiffs

20  lacked standing under Article III of the U.S. Constitution, that Plaintiffs failed to exhaust

21  their administrative remedies, that Plaintiffs' claims are barred by the doctrine of claim

22  preclusion, or res judicata, and that the NEPA claims fail on the merits.  (Doc. 88).  On April

23  9, 2010, the Federal Defendants also moved for summary judgment. (Doc. 92).  The Federal

24  Defendants argue that Plaintiffs lack standing, have failed to exhaust their administrative

25  remedies, that Plaintiffs' claims are barred by the equitable doctrine of laches, and that the

26  Federal Defendants complied with NEPA. (Id.)  On May 18, 2010, Plaintiffs filed a Motion

27  to Strike the reply briefs filed by the Federal Defendants and Intervenor-Defendant

28  Snowbowl on the grounds that Defendants have improperly introduced new evidence in their

1    reply and that such evidence is outside the administrative record and that Defendants' reply

2    briefs are unrelated to their Motions for Summary Judgment and are instead focused on

3    Plaintiffs' Summary Judgment Motion—therefore constituting impermissible sur-replies.

4    (Doc. 101).   On May 25, 2010, this Court issued an Order directing the Parties to submit

5    supplemental briefing on the issue of whether this "lawsuit is barred by the doctrine of claim

6    preclusion or res judicata." (Doc. 102).   The Court further Ordered that "as part of the

7    supplemental briefing, the Parties are directed to discuss whether privity exists between

8    Plaintiffs in this lawsuit and the plaintiffs in the case of <u>Navajo Nation v. United States</u>

9    <u>Forest Serv.</u>, 408 F. Supp. 2d 866 (D. Ariz. 2006), <u>affd</u>, 535 F. 3d 1058 (9th Cir. 2008)(en

10   banc), <u>cert. denied</u>, 129 S. Ct. 2763 (2009). Specifically, the Parties should address the fourth

11   and fifth exceptions to the rule against nonparty preclusion as set forth by the United States

12   Supreme Court in <u>Taylor v. Sturgell</u>, 128 S.Ct. 2161, 2172-73(2008) ("a nonparty is bound

13   by a judgment if she assume[d] control over the litigation in which that judgment was

14   rendered... [and] a party bound by a judgment may not avoid its preclusive force by

15   relitigating through a proxy")." (<u>Id.</u>)   On June 21, 2010, the Parties' supplemental briefs

16   were filed with the Court. (Docs. 107, 108, 109).

17        In September 2010, the Flagstaff City Council held a series of meetings in which it

18   considered the possibility of amending Snowbowl's contract to allow it to purchase

19   "recovered reclaimed" water for snowmaking.   Recovered reclaimed water is approved for

20   use as drinking water and if Snowbowl were to make snow using recovered reclaimed water,

21   the Plaintiffs' claims would likely be moot.  On September 16, 2010, Intervenor Defendant

22   Snowbowl filed a Supplement to its Reply in Support of its Cross-Motion for Summary

23   Judgment concerning presentations made by Plaintiffs before the Flagstaff City Council.

24   (Doc. 133).  In the supplement, Snowbowl argued that statements by the Plaintiffs at the

25   Flagstaff City Council urging the Council not to allow Snowbowl to purchase recovered

26   reclaimed water for snowmaking warranted dismissal of the lawsuit under the doctrine of

27   unclean hands.  Plaintiffs filed a response countering that their statements did not warrant

28   dismissal.

## II.     LEGAL STANDARD

The Ninth Circuit has endorsed the use of summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure for review of agency actions under the Administrative Procedure Act ("APA"). <u>Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.</u>, 18 F.3d 1468, 1471-72 (9th Cir. 1994). The court's role is not to resolve facts, but to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." <u>Occidental Eng'g Co. v. Immigration & Naturalization Serv.</u>, 753 F.2d 766, 769 (9th Cir. 1985). The administrative agency itself is the fact-finder; summary judgment is appropriate for determining "the legal question of whether the agency could reasonably have found the facts as it did." <u>Id.</u> at 770.  Under the APA, questions of law are reviewed de novo by the Court. See 5 U.S.C. § 706; <u>Memorial, Inc. v. Harris</u>, 655 F.2d 905, 911 (9th Cir. 1980) ("under the APA review provisions it is the Court which decides all relevant questions of law").  "Judicial review of agency decisions under NEPA . . . is governed by the [APA], which specifies that an agency action may be overturned only where it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)).

## III.     Defendants' Jurisdictional Claims

As an initial matter, Defendants argue that the Court should dismiss this case for lack of jurisdiction.  Defendants raise a number of jurisdictional arguments any one of which could dispose of this case without reaching the merits of the underlying NEPA claims.  These are addressed below.

### A.     Standing

The Defendants in this case argue that the Plaintiffs lack standing to bring this lawsuit. To establish standing a plaintiff must show that: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to the conduct of the defendant; and (3) a favorable federal court decision would be likely to redress the injury.  <u>Pit River Tribe v. U.S. Forest Service</u>, 469 F.3d 768, 778 (9th Cir. 2006).

1      Defendants argue that the Plaintiffs have not satisfied the "injury in fact" element

2   because Plaintiffs either do not recreate in the Snowbowl SUP area in which snowmaking

3   will take place or do not recreate it in ways that make it likely that they will ingest snow

4   made with reclaimed water.  Plaintiffs respond that the "injury in fact" element of Article III

5   standing in a NEPA case is satisfied if the plaintiff has an aesthetic or recreational interest

6   in the particular place and that interest will be impaired by the defendant's conduct. See, e.g.,

7   White Tanks Concerned Citizens v. Strock, 563 F.3d 1033, 1038 (9th Cir. 2009); Friends of

8   the Earth v. Laidlaw Envtl. Servs., 528 U.S.167, 183, 120 S.Ct. 693 (2000).  All of the

9   Plaintiffs use and enjoy the Snowbowl area for recreational and aesthetic purposes; they

10  claim that their recreational and aesthetic enjoyment of the area will be diminished if the

11  project goes forward and trees are cleared, a pipeline is run up the mountain and a massive

12  catch basin for reclaimed water is installed and if potentially unsafe snow made from

13  reclaimed water is used at Snowbowl.  Plaintiffs argue that these interests are sufficient to

14  satisfy the "injury in fact" requirement.

15      Plaintiffs' complaint, however, is specifically that the Forest Service failed to properly

16  consider and assess the possible health effects of people ingesting snow made from reclaimed

17  water.  So while Plaintiffs may have a general aesthetic and environmental interest in the

18  Snowbowl environment that will be affected by cleared trees, running pipelines and catch

19  basins, those broader aesthetic and environmental interests would not give them standing to

20  assert the specific claim brought in this case.  Plaintiffs' recreational interests in the

21  Snowbowl, however, could give them standing to assert their NEPA claim, if those

22  recreational interests are imperiled by the alleged insufficiency of the EIS.  See, e.g.,

23  National Park and Conservation Ass'n v. Stanton, 54 F. Supp.2d 7, 15 (D.D.C. 1999).  All

24  of the Plaintiffs in this case live in Flagstaff or near the Snowbowl and all of them recreate

25  at Snowbowl –  that they either ski, hike, snowshoe, gather snow, or play in the snow – at

26

27

28

1   Snowbowl.[1]   One of the Plaintiffs, Kristin Huisinga has even stated that she eats snow at

2   Snowbowl and Plaintiff Clayson Benally, has asserted that he bathes in the snow and uses

3   the snow there to make essential water/oil preparations used in healing ceremonies.  Plaintiff

4   Don Fanning says that he hikes and throws snow at Snowbowl.

5          Certainly, Plaintiffs who eat snow or bathe in the snow at Snowbowl have a suffered

6   a concrete injury in fact if the Forest Service failed to properly consider the health effects of

7   ingesting snow made from reclaimed water on Snowbowl.  Defendants stress that even if a

8   few of the Plaintiffs may satisfy the standing requirement, not all of them do because they

9   have not demonstrated that they are likely to ingest snow at the site where the snow made

10  from reclaimed water will be used.  As an initial matter, once one of multiple plaintiffs is

11  found to have standing, other plaintiffs' lack of standing is irrelevant for purposes of

12  determining whether to dismiss the suit on that basis. Arlington Heights v. Metropolitan

13  Housing Development Corp, 429 U.S. 252, 264, 97 S.Ct. 555 (1977) ("we have at least one

14  individual plaintiff who has demonstrated standing. . ."); Id. at n.9 (" Because of the presence

15  of this plaintiff, we need not consider whether the other individual and corporate plaintiffs

16  have standing to maintain the suit.").  Moreover, Defendants are incorrect that Plaintiffs have

17  to essentially demonstrate that they have concrete plans to go eat snow at the SUP area next

18  year in order to have standing in this case. The Plaintiffs' recreational interests in skiing,

19  snowboarding, snowshoeing, hiking and other activities on Snowbowl provide a sufficient

20  basis for standing since such recreational interests would be imperiled if the Forest Service

21  failed to properly consider the health effects of ingesting reclaimed water.   See, e.g., Florida

22

23

24          [1]The fact that some of the Plaintiffs allege only that they have recreated in the
    "Snowbowl" area, rather the specific SUP area in which snow made from reclaimed water
25  will be used does not deprive them of standing.  Plaintiffs have clearly stated that they
    recreate in the Snowbowl. The Snowbowl is a 777 acre area, 205 acres of which will have
26  snow made from reclaimed water.  Plaintiffs' claims thus are not like those of the Plaintiffs
    in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), who objected to 4500 acres of
27  mining on a 5.5 million acres who only vaguely alleged that their enjoyment of federal lands
    in the vicinity of these million of acres had been adversely affected.
28

1    <u>Public Interest Research Group Citizen Lobby, Inc. v. EPA</u>, 386 F.3d 1070 (11th Cir. 2004)

2    (Plaintiffs for whom the aesthetic and recreational values of the area will be lessened by the

3    degradation of water quality have standing to challenge EPA review of water standards,

4    including people who canoe and fish in waterbodies delisted from impaired waters list);

5    <u>Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546</u> (5th Cir. 1996)

6    (plaintiffs who lived near bay where "produced water" would be discharged, and used the bay

7    for recreation and expressed concern that "produced water" would impair their enjoyment

8    of activities because these depended on good water quality had alleged an injury in fact).

9         Defendants also argue that the injury is not actual or imminent, but rather conjectural

10   or hypothetical.  Of course, in this case none of the Plaintiffs has yet been injured by

11   ingesting snow made from reclaimed water and it is unclear when or if such an injury will

12   occur.  The Supreme Court has held, however, that "threatened injury" will satisfy the injury

13   in fact requirement for standing.  <u>Valley Forge Christian College v. Americans United for</u>

14   <u>Separation of Church and State, Inc.</u>, 454 U.S. 472, 464 (1982).  All of the Plaintiffs in this

15   case have indicated that they recreate on Snowbowl.  Ms. Huisinga, for example,  has stated

16   that she goes to the Snowbowl around thirty times per year and that she has a specific plan

17   to recreate in the Snowbowl area in April 2010.  Mr. Benally says he goes to the Snowbowl

18   approximately ten times a year  Mr. Fanning testified that in the previous year he had gone

19   to the Snowbowl more than ten times during the off-ski season and a couple of times during

20   the ski season.  Plaintiffs' injury is thus neither conjectural nor hypothetical.

21        The Defendants do not directly question that Plaintiffs' alleged injury is traceable to

22   the conduct of the Defendant, other than to state that there is no concrete injury.  The injury

23   the Plaintiffs have alleged is in any event traceable to the U.S. Forest Service's alleged failure

24   to consider the health effects of ingesting reclaimed water. And a decision by this Court that

25   the Forest Service needs to give further consideration of the health effects of ingesting

26   reclaimed snow would require additional review by the agency that could influence its

27   decision.  This satisfies the requirement that a favorable decision would redress the injury.

28   <u>Citizens for Better Forestry v. U.S. Dep't of Ag.</u>, 341 F.3d 961, 975-76 (9th Cir. 2003)

1   (quoting Public Citizen v. Dept.of Transp., 316 F.3d 1002,1019 (9th Cir. 2003) and citing

2   Hall v. Norton, 266 F.3d 977 (9th Cir. 2001)).

3       In addition, Plaintiffs have established a procedural injury.  To establish a procedural

4   injury a plaintiff must allege that an agency violated procedural rules; 2) that these rules

5   protect a plaintiff's concrete interests; and 3) that it is reasonably probable that the challenged

6   action will threaten their concrete interests.  City of Sausalito v. O'Neill, 386 F.3d 1186 (9th

7   Cir. 2004) (citing Citizens for Better Forestry, 341 F.3d at 969-70).  Again, Plaintiffs'

8   recreational interests are "concrete" and sufficiently threatened by the Forest Service's

9   alleged failure to properly consider the health effects of ingesting snow in preparing its

10  environmental impact statement.[2]

11      **B.**    **Exhaustion of Remedies**

12      Defendants also argue that the Plaintiffs failed to exhaust their administrative

13  remedies because they did not specifically comment on the snow ingestion issue in response

14  to the Draft Environmental Impact Statement and did not raise that issue in their appeals of

15  the Record of Decision to the Forest Service.  Defendants argue that while the Plaintiffs have

16  made comments and filed appeals about the Snowbowl upgrade, their comments and appeals

17  were not specific enough to the issue of human ingestion of snow made with reclaimed water

18  to put the Forest Service on notice and thus exhaust this claim.

19      Under the Forest Service regulations, a person must exhaust all administrative appeal

20  procedures, including submitting substantive comments and an appeal of the agency action.

21  This procedure allows the Forest Service to give the issue meaningful consideration and to

22  _____

23      [2] The Court also finds that the Save the Peaks Coalition has organizational standing.

24  An association has standing when 1) its members would otherwise have standing to sue in
    their own right; 2) the interests at stake are germane to the organization's purpose; and 3)

25  neither the claim asserted nor the relief requested requires the participation of individual
    members in the lawsuit.  Citizens for Better Forestry, 341 F.3d at 976. As discussed above,

26  the Coalition members do have standing.  Part of organization's purpose is to preserve the
    environmental integrity of the land on which the Forest Service is proposing to use

27  reclaimed water.  The relief requested does not require the participation of individual

28  members in the lawsuit.

have the first opportunity to resolve concerns.  Dep't. of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004); Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002). Administrative remedies are exhausted "if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged.  Great Basin Mine Watch v. Hankin, 456 F.3d 955, 968 (9th Cir. 2006). The claims raised at the administrative appeal and in the federal complaint must be "so similar" that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court. Native Ecosystems Council, 304 F.3d at  889.

In this case, the Plaintiffs highlight a number of statements in their comments to the Forest Service communicating their concerns regarding the health effects of ingesting reclaimed water.  Plaintiff Kristin Huisinga, for example, stated in her comments that "[s]ignificant levels of human birth control and pharmaceutical products are not removed in the process of water treatment.  These compounds are likely to cause severe defects in . . . humans. . .".  Plaintiff Clayson Benally in his comments stated "I'm also concerned about chemicals and pharmaceuticals  that aren't currently tested for, in this grade of wastewater." He added that reclaimed water "has only now been looked at for endocrine disruptors.  It is my understanding that the full impact is still unknown.  I urge you to have the foresight and allow these findings to be included into the EIS.  What affect [sic] will this have on people that may ingest this artificial snow."  Plaintiff Jeneda Benally states in her comments that "with known endocrine disrupters in the water, who will be responsible for any sickness that a child may develop from ingestion of effluent snow?"  Plaintiff Don Fanning states in his comments that "we'll be dealing with treated sewage that is undiluted with fresh water and people who will be falling in great frozen piles of the stuff and probably accidentally swallowing some.  Not to speak of children and even adults who indulge in the winter tradition of eating snow . . .".

Defendants claim that the Plaintiffs' comments are not sufficiently specific on the issue of health effects of ingesting snow made from reclaimed water.  Some of these

1   comments, however, particularly those of Plaintiffs Clayson and Jeneda Benally and Don

2   Fanning are specific on this issue.  Moreover, in order to provide sufficient notice a claimant

3   need only alert the agency in "general terms, rather than with precise legal formulations."

4   Rittenhouse, 305 F.3d at 965. As one Court has put it, "there is no requirement that an

5   intervenor must make every specific legal claim in the comment period or forfeit the right

6   to bring a case in federal court.  Rather a party need only alert agency to its contention."

7   Earth Island Institute v. Morse, 2009 WL 2423478 at *4 (E.D. Cal. 2009).  The comments

8   highlighted by the Plaintiffs plainly alert the Forest Service to their concern regarding the

9   health effects of exposure to snow from reclaimed water, including concerns about the effects

10  of ingestion.

11          Plaintiffs Save the Peaks Coalition, Clayson Benally, Jeneda Bennally and Berta

12  Benally also referenced their concerns regarding the health effects from exposure to

13  reclaimed water in their administrative appeals.  Their appeal stated:

14          The Forest Service never asked for interagency consultation on this matter
        from any substantial government authority including the National Institute of
15          Child Health…the Forest Service cannot even pretend to speak with any
        authority on these human health matters and their response to comments raised
16          concerning human health have been largely ignored in the FEIS. . . .The FEIS
        has failed to consider genetics and even pharmacogenomics in its insistence
17          on pollutants.

18  Plaintiff Kristin Huisinga stated in her appeal that Dr. Catherine Popper's study generated

19  data using water from Flagstaff showing that some compounds within an understudied group

20  called "endocrine disrupters" have detrimental effects of the thyroid and male reproductive

21  systems in salamanders and other amphibians and that these results have implications for

22  human health.  Plaintiff Don Fanning stated that his appeal incorporated his comments,

23  which he attached.  As previously noted Mr. Fanning's comments specifically expressed

24  concern regarding the health effects of ingesting snow.

25          Plaintiffs' comments and appeals clearly reference a general concern with the health

26  effects of exposure to reclaimed water and many explicitly express a concern regarding the

27  safety of ingesting reclaimed water.  The fact that not all of the Plaintiffs explicitly state at

28  either the comment or appeal stage that they are concerned about the health effects of

1    ingesting reclaimed snow does not mean that they failed to exhaust their remedies. Their

2    statements regarding the presence of chemicals and compounds in reclaimed water that could

3    have implications for human health are sufficiently similar to their claim regarding the health

4    effects of ingesting snow made from reclaimed water to give the Forest Service notice of

5    their current claims.   See, e.g., Rittenhouse, 305 F.3d at 965-66 (group's comments

6    concerning effects of alternatives on "old growth habitat" and "old growth dependent

7    species" were sufficient to exhaust claims regarding regulations requiring the monitoring of

8    species population trends because, "it would be unreasonable to require that the Conservation

9    Groups incant the magic words 'monitor' and 'population trends' in order to leave the

10   courtroom door open"); see also Morse, 2009 WL 2423478 at *4 (plaintiff's concerns

11   regarding stand densities and overthining alerted Forest Service of allegations that the agency

12   had applied wrong methodology and figures to assess stand density).  Moreover, a number

13   of courts assessing exhaustion of remedies in this context have stressed that compliance with

14   NEPA is a primary duty of the federal agency and that the onus should not fall on

15   commentators to point out flaws to preserve the ability to challenge actions. Native

16   Ecosystems Council, 222 F.3d at 559; Dep't of Transp. v. Public Citizen, 541 U.S. 752, 765

17   (2004). Considering the comments and appeal taken as a whole, the Court finds that the

18   Forest Service was on notice of Plaintiffs' concerns regarding the health effects of exposure

19   to snow made from reclaimed water and that Plaintiffs exhausted their administrative

20   remedies.

21           **C.    Res Judicata**

22           Defendants also argue that the claims of some or all of the Plaintiffs are barred by the

23   doctrine of res judicata because they were or could have been brought in the 2005 Navajo

24   Nation litigation.  To establish res judicata, the following elements are necessary 1) identity

25   of claims; 2) a final judgment on the merits; and 3) privity between the parties. Hells Canyon

26   Preservation Council v. U.S Forest Service, 402 F.3d 683, 686 (9th Cir. 2005).

27           To determine whether two lawsuits involve the same claim, the court looks at four

28   criteria: 1) whether the two claims arise out of the same transactional nucleus of operative

1   facts; 2) whether the rights or interests established in the prior judgment would be destroyed

2   or impaired by prosecution of the second action; 3) whether the two suits involve

3   infringement of the same right and 4) whether substantially the same evidence is presented

4   in the two actions.  Mpoyo v. Litton Electro-Optical Systems, 430 F.3d 985, 987 (9th Cir.

5   2005).  The first factor, however, is considered controlling.  Id. at 430 F.3d at 988.

6          The Plaintiffs' claims in this case are essentially that the Forest Service failed to

7   consider and address the health effects of ingesting snow made from reclaimed water when

8   preparing the FEIS and approving the Snowbowl upgrade project.  The Plaintiffs in the 2005

9   Navajo Nation lawsuit attempted to amend their complaint to add this same claim.  The

10  District Court denied the motion to amend, and its holding was ultimately upheld by the en

11  banc Ninth Circuit Court of Appeals.  Plaintiffs deny that their current claims and the claims

12  of the Plaintiffs in the Navajo Nation litigation arise out of the same nucleus of operative

13  facts.  They base their argument in part on the en banc panel opinion which found that the

14  Navajo Nation plaintiffs' complaint "did not include this NEPA claim or the factual

15  allegations upon which the claim rests . . ."  535 F.3d at 1079.  Whether two events are part

16  of the same nucleus of operative facts, however "depends on whether they are related to the

17  same set of facts and whether they could be conveniently tried together."  Mypoyo, 430 F.3d

18  at 987.  The fact that the Navajo Nation plaintiffs failed to state facts sufficient to raise the

19  claim asserted by the current plaintiffs does not mean that the claim did not arise from the

20  same nucleus of operative facts.  The Navajo Nation plaintiffs, like the Plaintiffs in this case,

21  challenged the Forest Service's action  in preparing the FEIS and approving the project under

22  NEPA.  The Navajo Nation decision addressed the environmental impact of using reclaimed

23  water to make snow.  408 F. Supp.2d at 876.  The plaintiffs in the Navajo Nation case even

24  attempted to amend their complaint to add claims of the Plaintiffs in this case indicating that

25  these were related to their other claims and could conveniently be tried together.  Therefore,

26  the two claims do arise from the same nucleus of operative fact and the "identity of claims"

27  element is satisfied.

28          Plaintiffs also deny that the Navajo Nation litigation reached a final judgment on the

1    merits of the claim because the Ninth Circuit Court of Appeals only affirmed the district

2    court ruling denying the Plaintiff's motion to amend the claim.  They argue that court's ruling

3    means that the claim was never properly before the court and so not decided on the merits

4    for purposes of res judicata.  Plaintiffs cite Hells Canyon Preservation Council v. U.S. Forest

5    Service in support of their claim. 402 F.3d 683.  In Hells Canyon, a Plaintiff voluntarily

6    withdrew a claim before the court ruled on summary judgment.  The Ninth Circuit Court of

7    Appeals ruled that because the action did not contain the claim there was no final judgment

8    on its merits for purposes of res judicata.  403 F.3d at 687.  The claim in this case, however,

9    was not voluntarily withdrawn by the plaintiffs in the Navajo Nation case.  Rather the

10   plaintiffs attempted to amend their complaint to add the claim and the court denied their

11   motion to amend.  The Ninth Circuit has ruled that "[d]enial of leave to amend in a prior

12   action based on dilatoriness does not prevent application of res judicata in a subsequent

13   action." Mpoyo, 430 F.3d at 988-89 (holding that denial of a motion for leave to amend a

14   complaint to add claims constituted a final judgment on the merits of the claim for res

15   judicata purposes). Moreover, "[t]he overwhelming weight of Ninth Circuit precedent stands

16   for the proposition that res judicata bars not only all claims that were actually litigated, but

17   also claims that could have been asserted in the prior action, as long as the prior action

18   resulted in a final judgment on the merits." Baker v. Voith Fabrics US Sales, Inc., 2007 WL

19   1549919 at * 5 (E.D. Wash. 2007), citing Tahoe Sierra Preservation Council, Inc. v. Taho

20   Reg'l Planning Agency, 322 F.3d 1064, 1078 (9th Cir. 2003); Stewart v. U.S. Bancorp, 297

21   F.3d 953, 956 (9th Cir. 2002); Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 396

22   (1981).  Thus, the Court finds that  there was a final ruling on the merits for purposes of res

23   judicata.

24          The final inquiry is whether the Plaintiffs in this lawsuit are in privity with the

25   plaintiffs from the earlier Navajo Nation litigation. Generally a non-party is not precluded

26   by res judicata from bringing claims that were or could have been brought in a previous suit

27   unless one of the following exceptions applies: 1) one person has agreed to be bound by the

28   determination of issues in an action between others; 2) a preexisting substantive legal

1   relationship exists between the person to be bound and a party to the judgment; 3) a nonparty

2   was adequately represented by someone with the same interests who was a party to the suit;

3   4) a nonparty assumed control over the litigation in which that judgment was rendered; 5)

4   a party bound by a judgment relitigates through a proxy and 6) certain circumstances under

5   a special statutory scheme such as bankruptcy and probate.  Taylor v. Sturgell, 553 U.S. 880

6   (2008).

7           Only the third, fourth, or fifth exceptions could potentially apply in this case.  The

8   Defendants point to a number of connections between the Plaintiffs in this case and the prior

9   litigation to establish that the current Plaintiffs were either adequately represented by parties

10  in the Navajo Nation lawsuit, assumed control of the prior litigation or are really now serving

11  as proxies for the plaintiffs in the first lawsuit.  Defendants stress that the plaintiffs in this

12  and the prior suit are represented by the same counsel, Mr. Howard Shanker, and that Mr.

13  Shanker prepared the administrative appeal for some of the plaintiffs in both cases.

14  Defendants also stress that some of the Plaintiffs in this litigation were either members of or

15  associated with organizations who were plaintiffs in the prior lawsuit such as the Sierra Club

16  and the Navajo Nation.  Defendants also point to the fact that some of the Plaintiffs have

17  solicited money to pay for the prior litigation and organized and attended protests and events

18  in support of the previous litigation.  Defendants also point to statements by attorneys for the

19  plaintiffs in the Navajo Nation litigation stating after termination of that earlier lawsuit that

20  they were considering other possible legal avenues, including one claim that the Ninth

21  Circuit Court of Appeals had not addressed.  Defendants also highlight a statement on the

22  Save the Peaks Website calling the earlier lawsuit "our prior court case".

23          The Court is not convinced, however, that there is privity between all of the Plaintiffs

24  in this and the Navajo Nation lawsuit.  As an initial matter, other than to point out that the

25  Plaintiffs in this case are represented by the same lawyer who represented the plaintiffs in

26  Navajo Nation, the Defendants have not alleged any connection between the plaintiffs in the

27  first lawsuit and two of the Plaintiffs in this case, Lisa Tso and Frederica Hall.  See Earth

28  First v. Block, 569 F. Supp. 415, 421 (D. Oreg. 1983) ("Even if this were the case, there are

1    parties to this action which were not parties to [the prior litigation] and were not in privity

2    with any party in that action. Since those non-parties cannot be bound by the prior decision,

3    the court would proceed in any event to order compliance with NEPA.")  Having the same

4    counsel, without more, is not sufficient to establish privity.  Southwest Voter Registration

5    Education Project v. Shelley, 344 F.3d 882, 904 (9th Cir. 2003).

6         In addition, none of the connections that the Defendants identify are sufficient to

7    establish that the Plaintiffs in this litigation were represented by the plaintiffs in Navajo

8    Nation.  Some of the Plaintiffs in this litigation were members of or affiliated with the

9    Navajo Nation, the Sierra Club and the Center for Biological Diversity, organizations that

10   served as plaintiffs in the Navajo Nation case.  Those organizations, however, were not suing

11   on behalf of a class or in representation of other members so that they are not in privity with

12   their members.  See Taylor, 553 U.S. at 894;  Cf. Yankton Sioux Tribe v. U.S. Dept. of

13   Health and Human Services, 533 F.3d 634, 641 (8th Cir. 2008).  A statement on the Save the

14   Peaks website calling the earlier litigation "our prior court case", although suspicious, does

15   not without more establish that all of the Plaintiffs in this litigation were adequately

16   represented by the plaintiffs in the prior litigation.

17        The fact that Plaintiffs in this case either helped raised money for or organized and

18   participated in rallies and events in support of the plaintiffs in the Navajo Nation lawsuit does

19   not come close to establishing that the plaintiffs in this case "assumed control"over the 2005

20   litigation. Rather, "to have control of litigation requires that a person have effective choice

21   as to the legal theories and proofs to be advanced in behalf of the party to the action . . . .It

22   is not sufficient, however, that the person merely contributed funds or advice in support of

23   the party, supplied counsel to the party, or appeared as amicus curiae." Virginia Hosp. Ass'n

24   v. Baliles, 830 F.2d 1308, 1332 (4th Cir. 1987).  Defendants cite cases in which the payment

25   of legal fees was mentioned by the court as evidence of control.  In those cases, however,

26   there was significant additional involvement by the party determined to be bound by the

27   judgment.  See Montana v. U.S., 440 U.S. 147 (1979) (government had active role in

28   reviewing and approving filings); Jones v. Craig, 212 F.2d 187 (6th Cir. 1954) (composer

assisted in preparation of defense and testified as witness in copyright infringement action).

As for the claim that the current Plaintiffs are serving as proxies for the plaintiffs in the prior suit, Defendants offer no evidence other than inferences based on statements by counsel for the Navajo Nation plaintiffs about pursuing other legal avenues including a claim that the Ninth Circuit did not rule on, as well as the current Plaintiffs' awareness and support for the prior litigation. Although Defendants raise a number of questions about how intertwined the plaintiffs from the Navajo Nation litigation are with the current Plaintiffs, Defendants have not established that the former are using the latter as a proxy.

The Court thus finds that insufficient evidence of privity has been provided so that the Plaintiff's claims are not barred by the doctrine of res judiciata.

**IV.    Laches**

Defendants also claim that Plaintiffs' claims are barred by the doctrine of laches. As an initial matter, the Court notes that the doctrine of laches is only sparingly invoked in environmental cases. See Preservation Coaltion v. Pierce, 667 F.2d 851, 854 (9th Cir. 1982). To establish laches as an affirmative defense, the party invoking the doctrine must show: 1) that the opposing party lacked diligence in pursuing claims; and 2) that the party invoking the doctrine suffered prejudice from that lack of diligence. Apache Survival Coal. v. United States, 21 F.3d 895, 905 (9th Cir. 1994). Whether laches bars a claim depends on the particular facts and circumstances of the individual case. Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846 (9th Cir. 2005).

Defendants' argument pertaining to laches is that all of the Plaintiffs in this case were aware of but failed to join the Navajo Nation lawsuit brought in 2005 and waited to bring this lawsuit until that first suit was resolved. Defendants argue that they are prejudiced, because they have been forced to litigate similar challenges to the same project challenged in a prior suit. Defendant Snowbowl also says that it has expended a great deal of resources on both the prior litigation and on the Snowbowl project before this action was filed.

The Plaintiffs do not deny that they were aware of and declined to join the 2005 lawsuit, waiting to file their current claims until the Navajo Nation litigation ended. Instead,

they argue that there has been no lack of diligence on their part since there has been no final agency authorization in this case.  Plaintiffs cite Ocean Advocates v. U.S. Army Corp of Engineers, 402 F.3d 846 (9th Cir. 2005) in support of their argument that they did not lack diligence.  In Ocean Advocates, the Ninth Circuit Court of Appeals reversed a district court ruling that Plaintiffs were barred by the doctrine of laches from challenging a permit issued by the Army Corps of Engineers to extend a pier. The Army Corps of Engineers had issued the permit in 1996 and Plaintiffs waited until 2000 to initiate their lawsuit.  Plaintiffs cite language from Ocean Advocates where the court notes that it had "held that delays of eight to ten years did not demonstrate lack of diligence." 402 F.3d at 863

A closer look at Ocean Advocates, however, indicates that the circumstances discussed in that case differ significantly from those in this case. The court in Ocean Advocates outlined the test for assessing a party's diligence, stating it should consider: 1) whether the plaintiff attempted to make its position known to the defendant before filing suit; 2) the defendant's response to the plaintiff and; 3) whether developments, such as construction or other visible changes can "motivate [a party] to investigate whether any legal basis exist[s] for challenging the project." 402 F.3d at 862.  As other courts have noted these factors cannot always be neatly applied to the facts of an individual case. See Preservation Coaltion, Inc., 667 F.2d at 854.

In assessing the plaintiff's diligence, the court in Ocean Advocates stressed that plaintiffs had initiated contact with the Corps within one year of the permit being granted and that it "maintained continued and consistent dialogue with the Corps until the Corps granted the permit extension in 2000." 402 F.3d at 862.  In addition, the project was effectively halted by additions made to the threatened species list that required further environmental review on the part of the Corps as well as permit extensions before the project could proceed and that the Plaintiffs were communicating with the defendants about this.  Id. Cases cited by the Ocean Advocates court in support of the statement that an eight to ten year delay would not necessitate a finding of laches involved circumstances in which either the nature of the project or the status of the environment changed significantly after its initial approval

1    so that Plaintiffs could not be faulted for failing to challenge the project earlier.  Coalition

2    for Canyon Pres. v. Bowers, 632 F.2d At 780 (9th Cir. 1980) (seven-year delay in bringing

3    suit opposing four-lane road was not lack of diligence because initial proposal was a two-way

4    road and final approval for a continuous four lane road was not granted until four years after

5    initial approval and Plaintiffs began letter writing and petition circulation campaign for two-

6    lane road); Preservation Coalition, Inc., 667 F.2d at 854-55 (ten-year delay in bringing NEPA

7    action against HUD for impact of urban renewal on historical landmarks was not due to lack

8    of diligence, because buildings at issue were not placed on national register until several

9    years after project was approved and plaintiffs did not know that any historic buildings would

10   be demolished until shortly before they filed suit).

11          This case differs in a number of important ways from the circumstances described in

12   Ocean Advocates.  First, the Plaintiffs in this case have not been engaged in an alternative

13   continued dialogue with the Forest Service since 2005 in an attempt to resolve their claims.

14   Rather, after participating in the comments and administrative appeal process, Plaintiffs

15   completely dropped communications with the Forest Service after 2005 until initiating this

16   lawsuit in 2009.   Inexcusable delay has been found for shorter periods than the four year

17   delay in this case.  See Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1338-39 (10th Cir.

18   1982) (three-year delay resulted in laches); National Parks and Conservation Ass'n v. Hodel,

19   679 F. Supp. 49, 53 (D.D.C. 1987) (same); City of Rochester v. U.S. Postal Service, 541 F.2d

20   967, 977 (2d Cir. 1976) (finding inexcusable delay when suit was filed less than two years

21   after the relevant agreement); Friends of Yosemite v. Frizzell, 420 F. Supp. 390, 397 (D. C.

22   Cal. 1976) (sufficient delay when suit was filed over three years after the project was

23   publicized and over two years after the relevant agency action), all cited in Apache Survival

24   Coalition v. U.S., 21 F.3d 895, 910 (9th Cir. 1994).

25          Second, neither the nature of the Snowbowl upgrade project nor the environment at

26   issue has changed fundamentally such that Plaintiffs only recently became aware of their

27   objections to the project.  Rather, the Forest Service approved the use of reclaimed water for

28   snowmaking in 2005 and Plaintiffs have been aware of and opposed to this since that time.

1    The final agency action for purposes of the APA occurred in February 2005 with the issuance

2    of the Record of Decision.  Without this final decision, the 2005 Navajo Nation lawsuit

3    challenging the same FEIS that Plaintiffs now challenge could not have gone forward.

4    Plaintiffs are thus claiming that although the Forest Service issued a final decision in 2005

5    that could be and has in fact been reviewed by the district court and the Ninth Circuit, until

6    every last permit necessary for the project is issued, successive plaintiffs can continue to

7    initiate serial lawsuits against the Forest Service in connection with its decision approving

8    the Snowbowl improvement project.  This makes little sense. As indicated above, although

9    there are limited circumstances in which a final agency action would not start the clock for

10   purposes of laches, those circumstances are not found in this case.

11         Perhaps the most significant difference, however, is the fact Plaintiffs sat by for years

12   while the lawsuit challenging the Forest Service decision on similar bases was initiated and

13   litigated by the Navajo Nation and other plaintiffs. Plaintiffs were admittedly aware of the

14   lawsuit and could have joined it, yet they elected instead to wait to bring their claims until

15   the initial lawsuit was resolved.  In this respect, the Plaintiffs in this case are rather like the

16   plaintiffs in Apache Survival Coalition v. U.S, 118 F.3d 663 (9th Cir.1997) ("Apache

17   Survival II"), in which the Ninth Circuit Court of Appeals affirmed a district court ruling that

18   plaintiffs were barred by the doctrine of laches.  In Apache Survival II, a coalition made up

19   of members of the Apache Tribe sought an injunction to cease construction of a system of

20   telescopes on Mount Graham in Arizona. The plaintiffs claimed that in approving a new site

21   for the project the Forest Service failed to comply with the National Historic Preservation

22   Act ("NHPA").  Only two years prior, a coalition made up of several environmental groups

23   had filed a lawsuit and successfully claimed that the new site was not authorized by

24   Congress.  Congress eventually intervened and approved the new site for the telescope.

25   When the Apache Coalition later sought the injunction on the basis of a NHPA claim, the

26   district court interpreted the Apache Coalition's failure to join the lawsuit by the

27   environmental coalition as lack of diligence and ruled that their claims were barred by the

28   doctrine of laches and the Ninth Circuit Court of Appeals affirmed.

1      The Plaintiffs in this case, like the plaintiffs in <u>Apache Survival II</u>, failed to join a

2  prior lawsuit in which other plaintiffs raised similar claims.  All of the Plaintiffs in this case

3  were aware of the other litigation and, as previously discussed, some of them were actively

4  supporting it through fundraising or generating awareness.  The only answer offered by the

5  Plaintiffs for their failure to bring the lawsuit earlier is that they were not needed.  It thus

6  appears that the Plaintiffs in this case like the <u>Apache Survival II</u> plaintiffs were "waiting to

7  bring suit until the challenges launched by other parties have failed," which the Ninth Circuit

8  found shows a lack of diligence warranting application of the doctrine of laches.  <u>See</u> <u>Apache</u>

9  <u>Survival II</u>,118 F.3d at 666; <u>see also</u> <u>Apache Survival I</u>, 21 F.3d 895 at 909.

10      Plaintiffs further argue that their claims cannot be barred by laches because there has

11  been no prejudice in this case.  Plaintiffs argue that prejudice in the environmental context

12  is generally measured by what Congress defines as prejudice. <u>Coalition for Canyon Pres.</u>,

13  632 F.2d at 780.  They thus argue that because the relief they seek is still practicable –

14  snowmaking from reclaimed water has not yet begun – there is no prejudice in this case.  Of

15  course, the prejudice suffered by the Defendant is also relevant.  As Plaintiffs acknowledged,

16  "[d]elay may be prejudicial if substantial work has been completed before the suit was

17  brought." <u>Pres. Coalition, Inc.</u>, 667 F.2d at 855; <u>see also</u> <u>Daingerfield Island Protective Soc'y</u>

18  <u>v. Lujan</u>, 920 F.2d 32, 40 (D.C. Cir. 1990); <u>Stow v. U.S.</u>, 696 F. Supp. 857, 863 (W.D.N.Y.

19  1988); <u>Friends of Yosemite</u>, 420 F. Supp. at 398.  Defendant Snowbowl had expended a great

20  deal of resources on the Snowbowl upgrade project before this action was filed.  As Plaintiffs

21  admitted at oral argument, the fact that the Snowbowl improvement project is almost

22  complete is problematic for purposes of prejudice in the laches context.  Moreover, Plaintiffs

23  entirely ignore the burden on the Defendants of repeatedly litigating serial and similar claims.

24  Although litigation by itself is not considered prejudicial for purposes of laches, "successive

25  challenges, where one plaintiff awaits the outcome of another plaintiff's [lawsuit] before

26  bringing its own claim," <u>Apache Survival II</u>, 118 F.3d at 666 n.5, generates a burden of a

27  different kind that is unduly prejudicial for Defendants.   The Court finds that the near

28  completion of the project coupled with the burden of serial and similar litigation is sufficient

1   to establish prejudice for a laches defense here.

2       Plaintiffs fail to explain how their failure to join the prior case is materially

3   distinguishable from that of the plaintiffs in <u>Apache Survival II</u>, [3] and the Court finds that

4   Defendants will be sufficiently prejudiced to satisfy laches. Therefore, based on the particular

5   circumstances of this case, the Court finds that Defendants have established this affirmative

6   defense.[4]

7   _____

8       [3]At oral argument Plaintiffs argued that the fact that in 2008 the Ninth Circuit Court
    of Appeals found for the <u>Navajo Nation</u> plaintiffs on the same claims that they bring here
9   excused their delay in bringing this litigation.  The Ninth Circuit's ruling in 2008, however,
10  does not excuse Plaintiff's failure to join the litigation in 2005.

11      [4] Because the Court finds that Plaintiffs' claims are barred by the doctrine of laches
    and in the alternative finds against Plaintiffs on the merits of the NEPA claims, the Court
12  only briefly addresses Defendants' other affirmative defense.  In a supplement to its Reply
    in support of its cross motion for summary judgment, Defendants asserted that Plaintiffs'
13  claims are also barred by the doctrine of unclean hands.  Defendant Snowbowl pointed to
    statements by Plaintiffs to the Flagstaff City Council, which was considering amending the
14  contract with Snowbowl to allow for the use of "recovered reclaimed" water for
    Snowmaking.  Because none of the health concerns associated with plain "reclaimed water"
15  apply to "recovered reclaimed" water, this change in the contract had the potential to moot
    this litigation.  Some of the Plaintiffs, including Berta Benally, Clayson Benally, Jeneda
16  Benally and Frederica Hall made statements before the City Council opposing amending the
    contract to allow for the use of "recovered reclaimed" water, citing a number of reasons,
17  some even specifically stating that they did not want the use of potable water approved for
    snowmaking because they wanted the lawsuit to go forward.  Defendant Snowbowl argues
18  that this is evidence of unclean hands because it reveals that Plaintiffs are not really
    concerned about the health effects of snow made from reclaimed water, but are instead
19  opposed to snowmaking from any source on Snowbowl so that this lawsuit is simply a
    pretext to delay project implementation.  While the Court notes that the history of this case
20  together with some of the Plaintiffs' comments against the use of potable water for
    snowmaking create an inference that the claims made in this case are a pretext for different
21  aims, which if established might bar the claims on the basis of unclean hands (<u>see</u> <u>Jicarilla</u>
    <u>Apache Tribe v. Andrus</u>, 687 F.2d 1324, 1340 (10th Cir. 1982)), the evidence offered by
22  Snowbowl is insufficient to establish this affirmative defense and bar the lawsuit.  The
    Plaintiffs' comments included other credible reasons for opposing the use of recovered
23  reclaimed water for snowmaking, including that this would be a poor use of a scarce
    resource.  Contrary to Defendants' assertion, Plaintiffs' position in this suit regarding the
24  health effects of reclaimed water does not per se preclude them from opposing the use of
    recovered reclaimed water for snowmaking.

25

26

27

28

1    **V.     NEPA Claims**

2           Although the Court finds that the claims in this case are barred by laches, the Court

3    also provides an alternative ruling on the merits of Plaintiffs' NEPA claims. When reviewing

4    an agency's FEIS, the Court applies the arbitrary and capricious standard. Native Ecosystems

5    Council, 304 F.3d at 891.  A reviewing court must "consider whether the decision was based

6    on a consideration of the relevant factors and whether there has been a clear error of

7    judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate

8    standard of review is a narrow one. The court is not empowered to substitute its judgment

9    for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971).

10   The Court must determine whether the document contained a "reasonably thorough

11   discussion of the significant aspects of the probable environmental consequences." Idaho

12   Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992). Courts apply a "rule

13   of reason" standard when making this finding. Center for Biological Diversity v. United

14   States Forest Service, 349 F.3d 1157, 1166 (9th Cir. 2003).  The agency must articulate a

15   "rational connection between the facts found and the choice made." Burlington Truck Lines

16   v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 246 (1962).  Under the rule of reason

17   standard the Court reviews the agency to ensure it has taken a hard look at the environmental

18   effects of the proposed action. "Once satisfied that a proposing agency has taken a 'hard look'

19   at a decision's environmental consequences, the review is at an end." State of Cal. v. Block,

20   690 F.2d 761 (9th Cir. 1981).  "[W]hile formal findings are not required, the record must be

21   sufficient to support the agency action, show that the agency has considered the relevant

22   factors and enable the court to review the agency's decision." Beno v. Shalala, 30 F.3d 1057,

23   1073 (9th Cir. 1994) "While [the Court] may not supply a reasoned basis for the agency's

24   action that the agency itself has not given, [the Court] will uphold a decision of less than

25   ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v.

26   Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), cited in River Runners for

27   Wilderness v. Martin, 2007 WL 4200677 at *13 (D. Ariz. 2007).

28          The Plaintiffs in this case allege that the FEIS does not contain a reasonably thorough

1  discussion of the significant aspects of the probable environmental consequences of the

2  project because it ignores the possibility of children and others eating snow made from

3  reclaimed wastewater.  As an initial matter, the Court notes that the Arizona District Court

4  as well as the Ninth Circuit in the Navajo Nation litigation previously determined that the

5  Forest Service complied with NEPA when considering the environmental impact of making

6  snow from reclaimed water. The District Court found that:

7
8

> [T]he record shows that the Forest Service conducted a reasonable scientific analysis of the environmental impacts of the proposed snowmaking based on the best available scientific evidence.

9
10
11
12
13
14

> First and foremost, it is important for the Court to note that the Arizona Department of Environmental Equality (ADEQ") has adopted water quality standards for the direct reuse of reclaimed water aimed at protecting health and the environment. Furthermore, the ADEQ specifically allows Class A+ reclaimed water – the class of water to be used at the Snowbowl – for direct reuse in snowmaking. As such, the Forest Service properly relied, in part upon the ADEQ's determination that snowmaking is an acceptable and safe use of reclaimed water. In addition, the Forest Service evaluated extensive data monitoring Class A+ reclaimed water from the Rio de Flag WRF for wastewater constituent as well as monitoring for metals, organic chemicals and other parameters.

15
16  408 F. Supp.2d at 876. This opinion was affirmed by the en banc Ninth Circuit. 535 F.3d at

17  1080.   Here, the Court takes note that Defendants filed a motion to strike Plaintiffs'

18  references to the initial Ninth Circuit opinion which reviewed the district court's ruling and

19  was ultimately overturned by the en banc Ninth Circuit decision.  The en banc Ninth Circuit

20  Court ordered that the panel decision not be cited as precedent.  To the extent Plaintiffs are

21  citing to the opinion to provide background on the case, they are permitted to do so.  The

22  decision, however, is not binding upon this Court, which must conduct its own analysis of

23  Plaintiffs' NEPA claims.

24       Although the District Court has already found and the Ninth Circuit has confirmed

25  that the FEIS at issue in this case included a reasonable analysis of the environmental impact

26  of using reclaimed water for snowmaking, Plaintiffs now claim that the agency failed to take

27  the requisite hard look at the potential effects of ingesting snow made from reclaimed water.

28  They argue that nowhere in the FEIS does the Forest Service even acknowledge the

1  possibility that people, specifically children, who recreate in the snow made from reclaimed

2  water may ingest snow.   For Plaintiffs to so narrow the critique of the FEIS after the courts

3  have already approved the agency's review of the environmental impact of snowmaking from

4  reclaimed water is a questionable approach to NEPA litigation. Swanson v. U.S. Forest

5  Service, 87 F.3d 339, 343-44 (9th Cir. 1996) (plaintiffs may not "fly speck" the FEIS  and

6  hold it insufficient on the basis of technical deficiencies).  Reviewing the FEIS, in any event,

7  it is clear that the agency's consideration of the impact of snow made from reclaimed water

8  on human health, including the possibility of ingestion was "reasonably thorough," Idaho

9  Conservation League, 956 F.2d at 1519, such that the decision of the Forest Service to

10  approve of the use of reclaimed water for snowmaking was not arbitrary and capricious.

11       As noted, the Forest Service relied in part on the ADEQ's authorization of the use of

12  A+ grade reclaimed water for snowmaking. The FEIS notes that Class A+ reclaimed water

13  is deemed safe for unrestricted recreational uses, such as skiing.  The FEIS includes the

14  following statement:

15       The State of Arizona allows Class A and A+ reclaimed water for direct reuse
         in snowmaking.  Due to the relatively high risk of human exposure to potential

16       contaminants in reclaimed water, ADEQ has developed strict and specific
         treatment requirements for reuse applications having higher degrees of public

17       contact, such as skiing, that include secondary treatment, filtration, and
         disinfection. In meeting these requirements, the reclaimed water is considered

18       acceptable for unrestricted recreational use.

19  The District Court explicitly approved of the Forest Service's reliance on ADEQ when

20  determining that the agency complied with NEPA in considering the environmental impact

21  of making snow from reclaimed water.  Navajo Nation, 408 F. Supp. 2d at 876.  The

22  Plaintiffs, however, fault the Forest Service for relying on Arizona's standards for the use of

23  reclaimed water rather than engaging in its own consideration of the possible risks of

24  ingestion.  The Plaintiffs make a related claim that in relying on ADEQ's standards, the

25  Forest Service failed to ensure the scientific integrity of its environmental analysis as is

26  required by 40 C.F.R. §1502.24, and failed to provide accurate scientific analysis, expert

27  agency comments and public scrutiny.  The Plaintiffs also claim that the Forest Service's

28  reliance on the ADEQ means that it failed to disseminate quality information on the potential

1   impact of ingesting snow made from Class A+ reclaimed water.  The Plaintiffs claim that the

2   failure to take a hard look, to ensure the scientific integrity of the analysis and to disseminate

3   quality information was arbitrary, capricious, and an abuse of discretion or not otherwise in

4   accordance with law or without the procedure required by law.  5 U.S.C. §706(2)(D).

5        As an initial matter, NEPA and its implementing regulations assume state and federal

6   agency cooperation.   42 U.S.C.S. §4331(a)(2007).   NEPA directs federal agencies to

7   incorporate "views of the appropriate Federal, State, and local agencies, which are authorized

8   to **develop** and enforce environmental standards." 42 U.S.C.S. §4332(C) (2007) (emphasis

9   added).  ADEQ is the agency designated by the Arizona Legislature to enforce the Clean

10   Water Act.  It is in connection with this function that ADEQ has developed the standards for

11   reclaimed water and established a permit program for  processing and using different grades

12   of reclaimed water.   The Forest Service's reliance on ADEQ's approval of snowmaking as

13   a use for A+ reclaimed water is in keeping with the "cooperative federalism" which

14   permeates water regulation under NEPA.   New York v. United States, 505 U.S. 144, 167

15   (1992).  Therefore, it is appropriate for the Forest Service to rely on ADEQ standards.  See,

16   e.g., Friends of the Payette v. Horsehoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th Cir.

17   1993)(Corps of Engineers properly relied on certification of compliance with state water

18   quality standards granted by Idaho DEQ in issuing environmental assessment and finding no

19   significant impact under NEPA); Border Power Plant Working Group v. Dep't of Energy,

20   260 F. Supp.2d 997, 1020-21 (S.D. Cal. 2003) (reliance on standards of another agency

21   designed to protect human health is appropriate in the NEPA process).

22        The Plaintiffs stress that although the ADEQ approved of the use of Class A+

23   reclaimed water for snowmaking, this does not specifically mean that the state agency

24   approves of the ingestion of Class A+ reclaimed water.  Rather the ADEQ prohibits the use

25   of reclaimed water for full immersion recreational activities, such as swimming or water

26   skiing, with a potential for ingestion.  The ADEQ also prohibits the use of reclaimed water

27   for evaporative cooling or misting.  Irrigation users of reclaimed water must also employ

28   application methods that reasonably preclude contact with drinking fountains, water coolers

1  or eating areas.  State regulations also require that wherever reclaimed water is used, signage

2  be posted, indicating that the water should not be ingested.   Thus, the Plaintiffs argue that

3  it was not appropriate for the Forest Service to rely on the ADEQ's approval of the use of

4  Class A and A+ reclaimed water for "snowmaking" in assessing whether the snow could

5  safely be ingested.

6          The Forest Service, however, considered and discussed ADEQ's reclaimed water

7  grading system as well as state standards for issuing permits for the use of reclaimed water.

8  The agency noted that ADEQ's determination that a particular grade of reclaimed water was

9  appropriate for a particular use was made in a risk-based framework to protect public health

10  and minimize hazards associated with potential exposures.  Recreational activities related to

11  snowmaking do not carry the same risk of exposure or ingestion as full immersion activities

12  such as swimming or waterskiing, or drinking reclaimed water from a drinking fountain.

13  Therefore, the fact that ADEQ does not approve of the use of reclaimed water for full

14  immersion activities such as swimming, does not approve of ingestion of reclaimed water

15  through a drinking fountain or does not approve of inhalation through misting and that it

16  requires signs warning people not to ingest the water, does not mean any and all ingestion

17  is considered unsafe.  Rather, it is inconceivable that the state would approve of the use of

18  Class A and A+ reclaimed water for snowmaking without considering the likelihood of

19  exposure, including some ingestion, that comes with recreation associated with snowmaking.

20  Indeed, the FEIS notes that reclaimed water is deemed safe by the state for irrigation of crops

21  as well as for schoolground, residential and open landscape irrigation, all of which also

22  involve some risk of ingestion.  It was not arbitrary and capricious for the Forest Service to

23  assume that the ADEQ, an organization tasked with developing and implementing standards

24  for water use, considered and accepted the relative risk of ingestion associated with

25  recreating in snow when it approved the use of Class A+ reclaimed water for snowmaking.

26  See Border Power Plant Working Group, 260 F. Supp.2d at1020-21.

27          Morever, although the Forest Service appropriately relied in part on state regulatory

28  standards regarding the use of Class A+ reclaimed water, this was not the extent of the

1   agency's investigation and discussion regarding the safety of ingesting snow made from

2   reclaimed water.  Rather, the Forest Service engaged in extensive discussion regarding the

3   safety of exposure to reclaimed water, including through ingestion.  The Forest Service

4   considered, for example, federal regulatory standards for drinking water and found that the

5   reclaimed water satisfied EPA standards for all substances tested.  The Forest Service also

6   considered that the EPA has explicitly mentioned snowmaking as a possible recreational use

7   for reclaimed water.  The Forest Service also considered a number of studies and reports on

8   reclaimed water use, including a report that found that Class A+ reclaimed water was suitable

9   for crop irrigation even where the crops would be consumed raw, as well as a study regarding

10  the use of reclaimed water as drinking water in Namibia.  The FEIS also cited reports from

11  Colorado and California, in which the use of reclaimed water as drinking water has been

12  considered, though not approved only because of the stigma of drinking reclaimed water. The

13  FEIS also contains information about studies concerning ingestion of wastewater comingled

14  with groundwater.

15      In addition to discussing the ADEQ's standards, federal drinking water standards, as

16  well as studies and reports regarding the use of reclaimed water, the Forest Service also

17  discussed at length the process for treating the water at the Flagstaff Rio de Flag treatment

18  plant, which will provide the water for snowmaking. The FEIS also discusses the various

19  monitoring and permit requirements for providing reclaimed water to be used for

20  snowmaking, including testing, treatment and reporting.  This included discussions of the

21  various means of removing most bacteria and pollutants from the water.  The FEIS also

22  discusses the quality of the Class A+ water used based on studies of the water from Rio de

23  Flag testing the water for levels of various particles.

24      In addition, the Forest Service also considered a number of studies that examined the

25  potential health impacts of exposure to a class of pollutants called endocrine disruptors,

26  which are contained in small amounts in reclaimed water.  One of the studies examined the

27  effects of Rio de Flag treated water on amphibians immersed in the water.  The FEIS noted

28  that while this study suggested that endocrine disruptors in the water may have some

1   potential health impact for humans, it also stressed that full immersion of amphibians in

2   100% reclaimed water represented a much greater level of exposure than humans recreating

3   in snow made from reclaimed water, some of which would likely be mixed with natural

4   snow.  The FEIS also cited other studies suggesting that there were no adverse human effects

5   from endocrine disruptors.  As the Forest Service makes clear, the scientific data regarding

6   the health effects of human exposure to reclaimed water is uncertain, with some studies

7   suggesting that certain compounds in the water do have potential for some health impact and

8   others indicating there is no impact on human health.

9        The FEIS thus includes extensive discussions of various factors relevant for assessing

10   the safety of ingesting reclaimed water, including discussions of the ADEQ standards and

11   permit requirements, studies on the impact of full immersion of animals in the water to be

12   used for snowmaking, studies and reports regarding the use of reclaimed water, including use

13   as drinking water, analysis of the composition of the water to be used for snowmaking, and

14   comparison with federal drinking standards, and discussion of the treatment the water will

15   incur before it is used to make snow.   In considering certain studies regarding the effects of

16   exposure to Class A+ reclaimed water, the FEIS  properly notes an absence of certainty or

17   consensus surrounding this issue with some of the data suggesting a possible harmful effect

18   of endocrine disruptors and other studies suggesting no effect.  This is entirely appropriate

19   and in compliance with NEPA.  See Salmon River Concerned Citizens v. Robertson, 32 F.3d

20   1359 (9th Cir. 1994) (NEPA does not require courts to resolve disagreements among various

21   scientists as to methodology); Robertson v. Metho Valley Citizen's Council, 490 U.S. at 350

22   (1989) ("NEPA merely prohibits uninformed agency action").   The Forest Service thus

23   provides a "reasonably thorough discussion of the significant aspects of the probable

24   environmental consequences"  Idaho Conservation League, 956 F.2d at 1519, such that its

25   decision to approve the use of Class A+ reclaimed water for snowmaking was not arbitrary

26   and capricious and the Court finds that as a matter of law, the evidence in the administrative

27   record permitted the agency to make the decision it id.  Occidental Eng'g Co. v. Immigration

28   & Naturalization Serv., 753 F.2d at 769.

The Court also concludes that in relying on the ADEQ and the EPA standards and in conducting its own extensive analysis of the available scientific information, the Forest Service did not fail to ensure the scientific integrity of its environmental analysis.  For the same reasons, the Court also finds that the Forest Service did not fail to disseminate quality information related to the potential impact of ingesting snow made from reclaimed water. The extensive information the agency provided in connection with its analysis constituted quality information.[5]

Although the Forest Service engaged in a thorough discussion regarding the safety of exposure to reclaimed water for humans sufficient to assess the safety of ingestion, Plaintiffs cite the fact that the FEIS does not explicitly mention the risk that individuals may ingest snow during recreation as evidence that the agency failed to properly consider this issue.  The Forest Service's responses to comments from the public, however, more directly and specifically address the risk that snow made from reclaimed water may be ingested by those recreating in it and what steps will be taken to minimize those risks.  The responses include the following statements:

> **[the proposal] has the potential to directly expose winter recreational users** and Snowbowl employees **to reclaimed water in the form of artificial snow. Potential exposure pathways include inhalation, ingestion, and dermal contact. The potential for incidental ingestion and dermal contact with snow are the primary routes of exposure given the water reuse is for**

---

[5]Plaintiffs offer no support for their claim that the Forest Service failed to disseminate quality information other than to state in their motion for summary judgment that the Forest Service improperly assumed that the ADEQ determined reclaimed water to be safe and failed to provide the requisite decisional documents to the public, and to make the conclusory allegation that "[r]egardless of whether or not the agency relied on ADEQ the Forest Service completely failed to disseminate 'high quality' information concerning the ingestion of snow." Plaintiffs failed to respond to Defendants' motion for summary judgment on this claim. Thus, even though the Court finds that the Forest Service did disseminate quality information on the potential impact of ingesting snow made from reclaimed water because it was appropriate for it to rely on the ADEQ and because the additional information it provided related to the additional inquiry it made regarding the safety of exposure to reclaimed water was quality information, the Court also concludes that because the Plaintiffs failed to respond to Defendants' motion for summary judgment on this point, they have abandoned this claim. Jenkins v. County of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).

snowmaking...[A]lthough direct and full body contact with artificial snow is expected to occur, the general need for winter garments to protect against wet and cold will limit the potential for and amount of dermal contact. Consequently, the use of reclaimed water use in artificial snowmaking is not considered to have a major negative impact to the public during recreation uses.

Conditions specified for the permitted reuse of reclaimed water under the City of Flagstaff Reclaimed Water Individual Permit are intended to minimize the risk of exposure and protect public health. **To minimize risks of ingestion at reuse sites there are requirements for signage advising the public of the use of reclaimed water. At the Snowbowl**, as at other open areas such as city parks and schools in Flagstaff where the reclaimed water is used, **signs will be posted to alert staff and recreational users that reclaimed water is used for artificial snowmaking and to avoid intentional ingestion of snow**.

(Response to comment 6.4 (5)) (emphasis added).  Another response states:

[t]he use of reclaimed water in the proposed snowmaking is not considered to have a major adverse impact to the public during recreational skiing and snow play. It should also be noted that reclaimed water used for public recreation, or any reuse application that has the potential for direct public contact is very strictly controlled. The Arizona Department of Environmental Quality (ADEQ) has developed regulations compelling specific advanced treatment requirements for reuse applications having higher degrees of public contact, such as skiing, that include tertiary treatment with disinfection. In addition ADEQ requires permits for all reclaimed water reuse that specify monitoring requirements, including frequent microbiological testing to assure pathogens are removed from wastewater, and reporting requirements. In meeting these requirements, the reclaimed water is acceptable for unrestricted body contact and authorized for artificial snowmaking for skiing by ADEQ.


If the snowmaking alternative is approved, **signs will be posted at the Arizona Snowbowl to inform the public that reclaimed water is used to make artificial snow and not to ingest the snow. To prevent illness from ingestion of reclaimed water in use at the Arizona Snowbowl as well as at City of Flagstaff parks and school grounds, the wastewater is disinfected by ultraviolet radiation followed by hypochlorite at the Rio de Flag WRF prior to reuse. Monitoring of bacterial levels is done daily to assure the reclaimed water is adequately disinfected.**

**[t]he use of reclaimed water in the proposed snowmaking is not considered to have a major adverse impact to the public during recreational skiing and snow play. It should also be noted that reclaimed water used for public recreation, or any reuse application that has the potential for direct public contact is very strictly controlled. The Arizona Department of Environmental Quality (ADEQ) has developed regulations compelling specific advanced treatment requirements for reuse applications having higher degrees of public contact, such as skiing, that include tertiary treatment with disinfection.** In addition ADEQ requires permits for all reclaimed water reuse that specify monitoring requirements, including frequent microbiological testing to assure pathogens are removed from wastewater, and reporting requirements. In meeting these requirements, the reclaimed water is acceptable for unrestricted body contact and authorized for artificial snowmaking for skiing by ADEQ.

(Response to comment 6.5) (emphasis added).  Still another response answering a comment about the possibility of children ingesting the snow states:

**There will be signs posted at Snowbowl informing visitors of the use of reclaimed water at a snowmaking water source.** Much like the areas of Flagstaff where reclaimed water is used, it **is the responsibility of the visitor or the minor's guardian to avoid consuming snow made with reclaimed water.** It is important to note that machine-produced snow would be mixed and therefore diluted with natural snow decreasing the percentage of machine produced snow within the snowpack. **Because ADEQ approved the use of reclaimed water, it is assumed different types of incidental contact that**

**could potentially occur from use of class A reclaimed water for snowmaking were fully considered**.

(Response to comment 6.42) (emphasis added).  These responses confirm that in examining the safety of using reclaimed water for snowmaking, the Forest Service was aware of and considered the fact that individuals, including children, recreating in the snow made from reclaimed water might ingest the snow.  The Plaintiffs argue that the response to the comments are not part of the FEIS and therefore cannot be considered when assessing the agency's response.  Courts can, however, look to the responses to comments for confirmation that an agency has taken the requisite hard look of an issue under NEPA.  <u>See, e.g.</u>, <u>Envtl. Prot. Info. Ctr. v. U.S. Forest Service</u>, 451 F.3d 1005, 1014-15 (9th Cir. 2006) (even if Forest Service erred by failing  to include a proposed timber sale in the EIS, it remedied the error by including a reasonably complete discussion of the issue in the comment response); <u>Native Ecosystems Council v. U.S. Forest Service</u>, 428 F.3d 1233, 1241 (9th Cir. 2005) (Forest Service's point by point response to comments "underscores our conclusion that the Forest Service took a hard look and fairly considered the Reynolds Report habitat recommendations").

The Court thus finds that the Forest Service took the requisite hard look at the possibility that individuals, including children, would ingest snow made from reclaimed water and that its decision to approve the use of Class A + reclaimed water for snowmaking was not arbitrary and capricious.  The Forest Service does not explicitly conclude that based on its review of the relevant information and studies, the incidental or even intentional ingestion of snow made from reclaimed water by children and adults that may occur during recreation will be safe.  Such a conclusion, however, is not necessary. <u>Beno v. Shalala,</u> 30 F.3d at 1073 ("[W]hile formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors and enable the court to review the agency's decision."); <u>see also</u> <u>C.K. v. New Jersey Dep't of Health & Human Servs.</u>, 92 F.3d 171, 183 (3d Cir. 1996) ("[T]he mere absence of formal findings is not a sufficient basis for reversal because the Secretary was not required under

1   the APA or [42 U.S.C. §] 1315(a) to make findings . . .") While this may mean that the FEIS

2   has "less than ideal clarity" on this particular issue, the Court finds that the Forest Service

3   engaged in a reasonably thorough discussion regarding the human health effects of exposure

4   to reclaimed water, including ingestion, from which "the agency's path may reasonably be

5   discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285.

6   Although the Plaintiffs have consistently conveyed to this Court their desire that the agency

7   had reached a different conclusion and determined that the potential risk to human health

8   posed by the ingestion of snow made from reclaimed water during recreation is too great to

9   approve the proposal, that is not the Court's decision to make. Robertson, 490 U.S. at 349.

10  "[T]he Court is obligated to defer to the responsible federal agency's informed assessment

11  of the scientific evidence." Navajo Nation, 408 F. Supp.2d at 878.  Based on the record

12  before it, the Court concludes that the Forest Service made such an informed assessment.

13  **VI.     Summary**

14         The Court finds that the Plaintiffs' claims are barred by the doctrine of laches.

15  Plaintiffs lacked diligence in pursuing their claims by knowingly failing to join the Navajo

16  Nation litigation initiated in 2005 and waiting to bring their lawsuit until that lawsuit was

17  complete.  This has prejudiced the Defendants because much of the improvement project is

18  now complete and both Snowbowl and the Forest Service have been forced to litigate and

19  may continue to be forced to litigate serial lawsuits filed by plaintiffs who without

20  justification delay bringing claims until resolution of other lawsuits.  In the alternative, the

21  Court finds that the Forest Service has taken the requisite hard look at the environmental

22  effects of the proposed challenged action.  Based on all of the information presented, the

23  Court finds that the Forest Service considered the relevant factors and that the evidence in

24  the record reasonably permitted the agency to make the decision it did.  There is an

25  / / /

26  / / /

27  / / /

28  / / /

insufficient basis for the Court to grant Plaintiffs' request and find the agency's decision was

arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

**Accordingly**,

**IT IS HEREBY ORDERED** denying Plaintiffs' Motion for Summary Judgment (Doc. 74)

**IT IS FURTHER ORDERED** denying Plaintiffs' request for injunctive relief

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgement. (Docs. 88 and 92)

**IT IS FURTHER ORDERED** denying Defendant Arizona Snowbowl Resort Limited Partnership's Motion to Strike Plaintiffs' Citations to the Vacated Ninth Circuit Panel Opinion.  (Doc. 85)

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion to Strike. (Doc. 101).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment for Defendants.

DATED this 30th day of November, 2010.

Mary H. Murguia
United States District Judge